Richard M. LEACH, Appellant,

v.

**BOARD OF EDUCATION OF the NEW CASTLE COUNTY VOCATIONAL–TECHNICAL SCHOOL DISTRICT, Appellee.**

Superior Court of Delaware,
New Castle.

July 25, 1972.

John P. Sinclair, of Potter, Anderson & Corroon, Wilmington, for appellant.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, for appellee.

STIFTEL, President Judge.

Appellant's teaching contract was terminated by Appellee after a hearing because of wilful and persistent insubordination and misconduct in office. He appeals to this Court.

▮ Was the finding of the Board supported by substantial evidence, as required by 14 Del.C. § 1414?* If substan-

---

* 14 Del.C. § 1414 reads as follows:
"*Judicial Review*
"A decision of the board shall be final and conclusive unless, within ten days after a copy thereof has been received by the teacher, the teacher appeals to the Superior Court for the county in which the teacher was employed. In case of every such appeal, the cause shall be determined by the Court from the record which shall include a certified copy of the evidence, findings and the decision of the board, without the aid of a jury. The notice of appeal and all other matters regulating the appeal shall be in the form and according to the procedure as shall be

tial evidence exists, this Court cannot substitute its judgment for the judgment of the Board; and, as a matter of public policy, findings of the Board of Education after a public hearing should not be set aside unless the record clearly contains no substantial evidence supporting the Board's findings. Board of Education, Laurel Special School District v. Shockley, 2 Storey 237, 155 A.2d 323, 327, 328.

A review of the record shows no arbitrary or capricious act of the Board. It shows substantial evidence for its action.

Appellant was a recalcitrant teacher. He was seldom compliant; had no respect for his immediate superiors and frequently demonstrated this. He wrote caustic and sarcastic letters to his superiors and consistently and persistently tried to embarrass them.

The last incident for which he was "guillotined" is a typical example of his troublesome behavior.

On October 6, 1971, a posted bulletin notified teachers that the place of their meeting had been changed from the cafeteria to two classrooms. Academic teachers were to meet in Room C–109 and Vocational teachers were to meet in C–102–104. Because some separate problems were to be discussed at each meeting, it was decided to hold two separate meetings rather than one. Prior to the meeting, the administrators had met for forty-five minutes to discuss the agenda and the Principal, Mr. Bronson, was to visit each meeting.

Immediately before the meeting, Mr. Leach spread the word that all teachers, Vocational and Academic, were to meet together. Consequently, when Mr. Mozzani arrived for the Academic meeting, only three teachers were in the room. The rest were with Mr. Herr. Mr. Cinaglia, head of the Faculty Policy Committee, and other teachers wanted the meeting together but it was Mr. Leach who took the responsibility of informing Mr. Herr that the faculty should be together, when nobody else spoke up.

When Mr. Bronson, the Principal, appeared, he was irate and non-plussed at the combined meeting, against the administrative decision. Mr. Leach added a little fuel to the fire by saying to him: "It is ridiculous for me to go down there and listen to Mr. Mozzani telling me one thing while Mr. Herr is up here telling them something else . . .". Mr. Bronson responded: "I will have you know you are not running this school. I am.", and then left the room. Leach, instead of going to the Academic teachers' meeting, went to Bronson's office to further discuss the matter with him because Leach felt Bronson did not understand the teachers' position.

Mr. Leach's conduct in getting all the teachers to go to one room rather than two was wilful and disruptive. It was a developed pattern of undetermining confidence in his superiors. Although other teachers may have, at times, behaved similarly, nevertheless, it was Leach's conduct that persisted and disunited.

A short time before the above incident, Leach took issue with a parking directive. He and Mr. Cinaglia had arrived at their respective meetings thirty-five minutes late and put identical questions to the respective Vice-Principals—namely, whether it was a request or an order about parking in

provided by the Rules of the Superior Court. The Court shall decide all relevant questions of law and all other matters involved, and shall sustain any board action, findings and conclusions supported by substantial evidence. The Court may reverse, affirm or modify the decision of the board or remand the cause to the board for a rehearing. In case any cause shall be remanded to the board for a rehearing, the procedure and the rights of all parties to such cause shall be the same as in the case of the original hearing before the board. If the decision is in favor of the teacher, he shall be reinstated and shall receive all salary lost as a result of his temporary dismissal or suspension."

a certain area of the parking lot. Even though Mr. Herr and Mr. Mozzani used different words, they clearly meant that the teachers obey the directive in limiting their parking. Leach argued with Mr. Mozzani, his Vice-Principal, that he did not have to comply since Mr. Herr's directive was different from Mozzani's. The order pertaining to parking was changed by the administration soon thereafter, but Mr. Leach's conduct clearly evidenced wilful disrespect.

When Mr. Leach came to Delaware in 1969, he did not come highly recommended, but he impressed the Delcastle administrators when he candidly admitted that he formerly had had problems with administrators; and consequently, he was hired for the 1969–70 school year.

In September, 1970, Principal Bronson prepared and reviewed with Mr. Leach an evaluation letter which, in pertinent part, reads:

"Too often during the past year you made selfish decisions that showed irresponsible and unprofessional conduct in the eyes of the administration. . . . Despite your 'thing' about administrators there is no workable alternative for this year other than to work together harmoniously . . .".

There were other Leach incidents that disturbed the administration. On January 14, 1971, the day before Martin Luther King's birthday, the administration announced at a faculty meeting that January 15 would be a holiday. Previously, teachers had been instructed to come to school. Leach was opposed to the change and after the faculty meeting was adjourned by the Superintendent, Leach attempted to reconvene the meeting to discuss the matter further. Leach, himself, explained what he did as follows:

". . . I got up and I said, 'Wait a minute. Do we want to talk about it? . . .' "

On the holiday, Mr. Leach and a number of other teachers went to school and refused to treat it as a holiday. This was done partly at the instigation of Mr. Leach.

In September, 1971, Mr. Leach, in a supercilious vein, called the Principal to come down and unlock a door for him, saying he was following the administrative orders concerning this particular door, which was to be the door for entering and leaving the building. Actually, there was another door nearby which was open that could have been used. Also, there were custodians at hand with keys. Also, Mr. Leach called Vice Principal Mozzani in the early part of the 1971–72 school year and told him to come to Mr. Leach's classroom and straighten out the chairs, which had been turned around by the night-school class. Mr. Mozzani politely suggested that Mr. Leach contact the custodian instead.

The evaluation letter of September 1, 1971, aptly describes Mr. Leach when it says, in effect, that his potential will only be realized at Delcastle ". . . after you have matured enough to stop rebelling for the sake of rebelling, . . .".

There were additional incidents of disrespect for the system. Leach ignored requests to promptly submit attendance records. He summarily dismissed a student from class with a note to the Vice-Principal that the student was never to come to his class again and that, ". . . There will be no punishment that will make me change my mind." In reality, the student did return to his class and he helped the student immeasurably, for which he was commended. But Mr. Leach continued to rebel for rebellion's sake and the record clearly demonstrates this.

█ The Board was not limited to consideration of incidents that occurred after his rehiring contract for the 1971–72 season. It had the right to consider appellant's non-cooperation throughout the period of his school employment. Redcay v.

Board of Education, 13 N.J.L. 369, 33 A.2d 120 (1943); Pearson v. Board of Education Community Unit School Dist. No. 5, 12 Ill.App.2d 44, 138 N.E.2d 326, 331 (1956). His history is one of wilful and persistent insubordination. The Board had a right to do what it did on the evidence before it. It was substantial.

 Defendant also argues that the Board's findings and conclusions should be reversed because of denial of due process. He claims that no fair hearing could be held when the Board is the judge, jury and prosecutor. In Board of Education, Laurel Special School District v. Shockley, *supra,* the Supreme Court rejected the same contention by implication. The denial of due process in such situations has been generally rejected. See 2 Davis, On Administrative Law, p. 175; 1 Am.Jur.2d 873, § 78. Due process requires a fair hearing. This record shows there was one.

The dismissal is affirmed.

It is so ordered.