**BOARD OF EDUCATION OF THE SMYRNA SCHOOL DISTRICT, Appellant,**

v.

**John DiNUNZIO, Appellee.**

Superior Court of Delaware, Kent County.

Submitted: Sept. 6, 1989.
Decided: March 14, 1990.

Nicholas H. Rodriguez and Catherine T. Hickey of Schmittinger & Rodriguez, P.A., Dover, for appellant.

Roger A. Akin of Sawyer & Akin, P.A., Wilmington, for appellee.

OPINION

RIDGELY, Judge.

This is an appeal by the Board of Education of the Smyrna School District ("Smyrna Board") from a decision of the State Board of Education ("State Board")

which reversed the decision of the Smyrna Board to terminate the employment of Smyrna School District Superintendent Dr. John DiNunzio ("Dr. DiNunzio"). Dr. DiNunzio was fired by the Smyrna Board after it was disclosed in January of 1988 that the school district faced a budget deficit as high as $500,000. Dr. DiNunzio requested a termination hearing, and an impartial hearing officer was appointed. After consideration of testimony presented over 10 days, 40 exhibits, and the briefs of counsel for the school district and Dr. DiNunzio, the hearing officer found that there was good and just cause to terminate the superintendent's employment. The hearing officer's findings of fact and conclusions of law were adopted by the Smyrna Board, and Dr. DiNunzio appealed to the State Board pursuant to 14 *Del.C.* § 1058. After consideration of the record and the arguments of counsel, the State Board issued a written decision including findings of fact, conclusions of law, and its reasons for reversing the Smyrna Board's decision.

In this appeal, the Smyrna Board contends that (1) the State Board erred in making its own findings of fact and substituting its judgment on appeal, (2) the Smyrna Board's decision was rational and based on substantial evidence, and (3) the State Board's action was arbitrary and capricious. Dr. DiNunzio responds that the State Board's decision was supported by substantial evidence, (2) the State Board properly performed its appellate role, and (3) the State Board adhered to proper procedures and also rendered a fair decision in accordance with these procedures and State law.

This Court concludes that the State Board erred as a matter of law when it made factual findings and substituted its own judgment of the facts for that of the hearing officer and the Smyrna Board. I further conclude that the State Board erred as a matter of law when it determined that the Smyrna Board's decision to terminate Dr. DiNunzio's employment was unsupported by substantial evidence, was arbitrary and capricious, and was incorrect as a matter of law. Although the State Board

correctly ruled that the Smyrna Board's concern over the passage of a tax referendum was an insufficient basis for termination of employment, there was other substantial evidence before the Smyrna Board to support its own complete loss of confidence in Dr. DiNunzio's ability to manage the fiscal affairs of the school district. The Smyrna Board's conclusion that there was good and just cause for the termination of the contract was free of reversible legal error. Accordingly, I reverse the decision of the State Board.

## I. Procedural History

On January 27, 1988, the Smyrna Board voted to terminate the employment of Dr. DiNunzio as superintendent of the Smyrna School District. By letter dated February 2, 1988, the Board advised Dr. DiNunzio of the reasons for its decision. His contract provided that the Smyrna Board could terminate his employment prior to its expiration only for good and just cause, and that he was entitled to a fair hearing before the Smyrna Board or a hearing officer designated by the Board. After Dr. DiNunzio requested a hearing, the Smyrna Board appointed N. Maxson Terry, Jr., Esq. as an impartial hearing officer ("hearing officer") to hear this matter. The parties stipulated that the Smyrna Board would accept the hearing officer's findings on the issue of just cause.

A hearing was held on March 28, 29, and 30, April 6, 7, 14, 15, 27, and 29, and May 6, 1988. Following the completion of the hearing, the hearing officer issued his written decision wherein he concluded that certain findings related to the fiscal affairs of the school district supported a termination for good cause. He rejected other non-fiscal related allegations made by the school district. The hearing officer recommended termination, and the Smyrna Board thereafter adopted his findings of fact and conclusions of law.

## II. The Hearing Officer's Decision

### A. The Hearing Officer's Findings of Fact

A summary of the hearing officer's factual findings is as follows. Dr. DiNunzio

was hired as superintendent on July 1, 1985 under a three-year employment contract. The Smyrna Board wanted to employ a superintendent who was strong in the areas of curriculum and educational programs. Although Dr. DiNunzio was told that he could rely on his administrative assistant, Mr. John Granan, to handle finances, Dr. DiNunzio understood that the superintendent was the administrative head of the school district with ultimate administrative responsibility for its financial affairs.

His first employment evaluation dated July 8, 1986, confirmed this fiscal responsibility. Although the evaluation was favorable overall, it pointed out deficiencies in the area of finances. It also prescribed corrective action to be taken by Dr. DiNunzio to improve fiscal planning, budgetary development, and budgetary interpretation. It was noted that Dr. DiNunzio needed to learn the State funding system and that he needed to more correctly project budget items. Dr. DiNunzio acknowledged these criticisms.

In the spring of 1987, the Smyrna School District discovered it would run a deficit for fiscal year 1987. Ultimately, the Smyrna Board had to borrow $168,000 from a local bank to cover the shortfall. The major cause of this deficit was the commitment of 100 percent of new local funds to teachers in a contract effective July 1, 1986 to June 30, 1988. The team for the Smyrna School District which negotiated the contract was composed of Smyrna Board members. The deficit problem was compounded when Dr. DiNunzio recommended the hiring of 13 new teachers to protect federal funds, but he provided no accurate budgeting data on how they would be paid. The Smyrna Board directed Dr. DiNunzio to cut expenses to eliminate the deficit.

In June 1987, the annual evaluation of Dr. DiNunzio was favorable overall, but it was again critical of his performance in fiscal matters. He was placed on probation by a letter that gave him detailed instructions to improve the budgetary process. The Smyrna Board relieved Mr. Granan of his responsibility for fiscal matters, and he was replaced by Mr. Larry E. Koppenhaver.

After the deficit was discovered, Dr. DiNunzio and Mr. Koppenhaver worked diligently to resolve the financial crisis and prepare a budget for fiscal year 1988. In December 1987, the Smyrna Board renewed Dr. DiNunzio's contract for one year. Its decision to renew was based in part on its belief that the deficit would not exceed $168,000 for fiscal year 1988. This expectation was conveyed to the Smyrna Board by Mr. Stephen Faulkner, an acquaintance of Dr. DiNunzio, soon after he had talked with the superintendent about the anticipated deficit. However, in January 1988, the Smyrna School District staff told the Smyrna Board that the projected deficit for fiscal year 1988 was as high as $500,000.

Two other events occurred after the contract renewal that affected the Smyrna Board's confidence in Dr. DiNunzio's performance. First, as part of a presentation at a public meeting, Dr. DiNunzio's staff showed a slide containing the word "overcommitment" that may have antagonized district teachers. Second, Dr. DiNunzio presented a "Positive Action Plan" for paring the budget to a citizens' advisory committee on January 17, 1987 for its reaction before submitting it to the Board. The plan was not submitted to the Smyrna Board until several days later.

As a result of his findings, the hearing officer drew the following factual conclusions:

(1) Dr. DiNunzio as the superintendent had the ultimate responsibility for seeing that the school's budgetary and fiscal affairs were properly handled. He was required to have a good working knowledge of school finances which is complex and confusing at times.

(2) He should have recognized shortly after his employment that the District had an inadequate budget procedure and that meaningful information was not being given to the Board upon which it could reasonably be expected to make accurate financial decisions.

(3) The deficit was the product of numerous things. A major item was the overexpenditure of salaries. However, other expense items contributed to the deficit. It was the product of many items and no one item can be singled out as the cause of the deficit. It was caused because the Board was not being given accurate or meaningful financial data. The Board never had a real budget and although it was given plenty of financial information, including expenditures, this was never related to income in any meaningful way to show that a deficit was building.

(4) Much of the blame lies with Mr. Granan but Dr. DiNunzio should have had sufficient knowledge of school finances to perceive early on in his employment that Mr. Granan was not supplying the Board or himself with the data needed to make sound financial decisions and that he lacked the skills needed to do his job.

(5) Even the Board became aware of this problem by July 8, 1986 when it evaluated Dr. DiNunzio and instructed him to get on top of this situation. However, conditions appear to have proceeded ahead with no change or warning until April 7, 1987 when the deficit appeared.

(6) Although the Board negotiated the July 1, 1986 contract with the teachers Dr. DiNunzio and the staff reviewed it. Mr. Granan used the wrong figures in the salary matrix. And later 13 teachers were employed with no real understanding where the local share of these salaries would come from. The superintendent should have been sufficiently aware of the facts to at least warn the Board of these matters. In any event he should have made certain that there were available funds to hire the thirteen new teachers.

(7) After the deficit appeared, Dr. DiNunzio and Mr. Koppenhaver worked diligently to straighten things out but Mr. Koppenhaver was in over his head with work and couldn't do the job. Aside from urging him on, Dr. DiNunzio was unable to help because of his lack of knowledge of the financial system.

(8) The Board subsequently renewed his contract in December 1987 for one year and still considered that he was on probation. When the projected deficit figure came out for FY 88 in an amount much larger than anyone expected and when the Board learned that Dr. DiNunzio believed in December that the deficit would be no greater than FY 87 and had told that to Mr. Faulkner at a time when anyone with knowledge of the facts would know that that was not the case, the Board looked back over the past events, considered the failure to make the deletions from the public presentation, and the failure to promptly transmit the action plan and concluded that it no longer had any confidence in Dr. DiNunzio's ability to lead the District out of its financial morass. I realize that the Board also considered the October 20, 1987 letter but I am not according it any weight in light of my prior finding in respect to it. It then voted to terminate his contract. The Board, or at least some members, believed that these recent events which had come to their attention indicated that problems with Dr. DiNunzio which they thought were resolved were in fact not.

(9) The Board also believed that the community had lost confidence in Dr. DiNunzio and that a referendum to raise taxes which was essential to the fiscal crisis would not pass so long as he was the superintendent.

(10) In regard to the other non-fiscal related allegations made by the Board such as low teacher and staff morale, unionization of some employees, failure to foster an esprit de corps, dictatorial attitude, lack of commitment and direction to the gifted and talented program, deficiencies in the special education program, high school discipline code, eighth grade realignment and friction with the PTO, I find that the District did not carry its burden of proof. Dr. DiNunzio performed his duties in those areas well and in accord with directions set by the Board.

## B. The Hearing Officer's Conclusions of Law

In the next section of his decision, the hearing officer concluded as a matter of law that there was just cause to terminate Dr. DiNunzio's employment. First, he reasoned that Dr. DiNunzio had failed in his responsibility to supervise the financial affairs of the district. The failure continued over a two-year period despite two critical evaluations of his performance in this area. Because the Smyrna Board was not given meaningful financial data or a satisfactory proposed budget, the Board lost control of its budget.

Second, the hearing officer also relied on (a) the misunderstanding of the projected 1988 deficit; (b) Dr. DiNunzio's failure to delete the objectionable language from his presentation before the citizens' committee; and (c) Dr. DiNunzio's failure to give the Smyrna Board his Positive Action Plan immediately.

Finally, the hearing officer concluded that the Smyrna Board decided to terminate Dr. DiNunzio in part to appease the Smyrna community and promote the passing of a tax referendum. He concluded that this political aspect of the Board's decision was a legitimate ground upon which to find just cause.

## III. The State Board's Decision on Appeal

### A. The Findings of Fact of the State Board on Appeal

In its written decision, the State Board described the evidence submitted and the "positions" of the parties. The State Board then found the following facts:

1. Appellant was hired on July 1, 1985 for the position of Superintendent on the understanding that he was to be primarily responsible for curriculum and educational policy. He was told that the Administrative Assistant was capable of handling District finances.

2. Appellant was not present when the Smyrna Board negotiated with the teachers in the fall of 1985, just after he was hired. He was not consulted about the Board's intention to commit 100% of new local funds to teachers' salaries, and had advised the Board prior to their agreement not to pledge more than 85%. The Smyrna Board's commitment of 100% initiated the District's serious financial problems.

3. Appellant was evaluated in June of 1986, at the end of his first year, and with the exception of finances, received a very positive evaluation. With respect to finances, Appellant was urged to provide better projection of budget items and better oversight of the preparation of figures. During the course of the following year, the District converted to the State's new DFMS budgeting system, and went from a manual to a computerized system.

4. Neither Appellant nor the Smyrna Board had reason to know that the Administrative Assistant had used incorrect figures in calculating the budget, or that incorrect figures were used in the matrix adopted as a part of the salary negotiation.

5. Once Appellant was informed of the deficit, on April 7, 1987, he and his Administration cut expenses in order to try to eliminate the deficit, and sought and obtained a loan for $168,000 to cover the shortfall.

6. Appellant was placed on notice in his evaluation of June, 1987 that it was his responsibility to oversee the development of a District-wide budget that was understandable by the lay members of the Smyrna Board. With the exception of the financial area, this evaluation was as positive as the prior one. Nevertheless, the Board placed Appellant on probation, with one of the conditions being that a working budget for FY 88 be presented in September, 1987.

7. The Smyrna Board reduced the central staff from four to three administrators at the time of the fiscal crisis. The board replaced the previous Administrative Assistant with Mr. Koppenhaver. In the late summer, fall and early winter, the Administration was besieged with requests for information from agencies and in response to the PERB hearing which

made budget preparation more difficult. The Smyrna board approved Koppenhaver's request for an extension to January, 1988 in which to produce the FY 88 budget.

8. The evidence was too conflicting to determine if either party was at fault with respect to the advice letter from the Smyrna Board's counsel on possible settlement of the PERB matter.

9. At the time the 13 additional teachers were hired, Appellant and the Smyrna Board had the same information available to them about the need for the teachers and the fiscal situation of the District; it was the Board that made the ultimate decision to hire the teachers despite insufficient budgetary information.

10. At the time Appellant's contract came up for consideration for renewal in November, 1987, the Smyrna Board knew at that time that it could decide not to renew Appellant's contract without the need to show "good and just cause." It knew that it had placed Appellant on probation. It knew that the budget was not projected to be complete until January. Yet, the Smyrna Board chose to rehire Appellant for one year, and potentially three, without making it apparent that it was continuing the probation of Appellant or making the contract contingent upon the production of a budget to the satisfaction of the Board.

11. Just as Appellant and his Administration had produced a budget, gained a greater appreciation of the deficit, and prepared a plan to cope with the shortfall, Appellant was terminated before the plan could be presented.

12. The "Faulkner Conversation" involved a failure of Appellant and Faulkner to communicate, which left Faulkner with the impression that the deficit was less than it possibly could have been. There was no evidence of an intent by Appellant to mislead.

13. There was no evidence that the use of the "Overcommitment Slide" was deliberate defiance of the Smyrna Board. Rather, it again was a misunderstanding over what the Staff assumed was approval by the Board, or at least its Chairman. There was no intimation by the Staff at the teacher meeting that the teachers or their union were at fault for the deficit at the time that the overhead slide was used. The word "overcommitment" was in common use to describe the action of the Smyrna Board in agreeing to the 100% commitment.

14. The "Positive Action Plan" incident occurred when Appellant and his staff had developed a proposal to remedy the District's fiscal problems and the plan was scheduled to be presented to the Board by Appellant. A draft had been shared, as was customary with most of the financial plans, with the Advisory Committee, which was chaired by a Board member, on January 17, and had been praised. When it was passed out to Board members on January 24, in preparation for the January 27 meeting with Appellant, Koppenhaver made the remark that intimated that things sometimes stayed on Appellant's desk too long. This infuriated the Board members at a time when some of them had already called for Appellant's termination.

In the section of its decision entitled "CONCLUSIONS OF LAW," the State Board also found that the Smyrna Board's reaction to the "Faulkner Conversation," Faulkner's letter, and the "Overcommitment Slide" were either an "over-reaction" or "pretextual."

### B. The Conclusions of Law of the State Board

In its conclusions of law, the State Board upheld the good-and-just-cause definition adopted by the hearing officer, and it also agreed with him that the teacher-termination law within 14 *Del.C.* ch. 14 was inapplicable to the superintendent.

The State Board then determined that the hearing officer erred in applying the good-and-just-cause standard to the facts. It determined that, after January 1, 1988, there was no substantial evidence to show that good and just cause then existed to terminate Dr. DiNunzio's employment. Af-

ter noting its own view that "it stretches credulity to believe that [the Smyrna Board] members in December thought they would be presented with final figures ... as low as ... \$168,000," the State Board determined that it was arbitrary and capricious to base the termination on the "Faulkner Conversation" and that the Smyrna Board's reaction to the "Overcommitment Slide" was "pretextual." Furthermore, the Smyrna Board's political concerns about the passage of a tax referendum were found by the State Board to be an insufficient basis for termination.

On the subject of Dr. DiNunzio's fiscal abilities the State Board said:

> [H]e was in greater control of finances in January than in December. He had produced a budget when he said it would be produced, a relatively final determination of the true extent of the deficit and a plan to cope with it. These facts do not support a conclusion that Appellant had an inability to control finances in January that was of such significance in comparison to his ability in December so as to warrant termination.

After acknowledging that its role on appeal was not to substitute its judgment for the judgment of the local districts, the State Board concluded that the decision reached by the hearing officer and adopted by the Smyrna Board was unsupported by substantial evidence, arbitrary, capricious,

and incorrect as a matter of law. This appeal by the Smyrna Board followed.

## IV. The Scope of Judicial Review

■ On an appeal from an administrative agency, this Court's appellate role is limited to determining whether there is substantial evidence in the record to support the agency's factual findings and to correct errors of law. 29 *Del.C.* § 10142[1]; *see Mooney v. Benson Management Co.,* Del.Super., 451 A.2d 839 (1982).

## V. Discussion

### A. The State Board's Scope of Review

The Smyrna Board first contends that the State Board erred in making its own findings of fact and substituting its judgment on appeal.

■ The State Board has adopted rules and regulations pursuant to 14 *Del.C.* § 1058[2] that govern the hearing of appeals to the State Board from the decisions of local boards of education. Under those rules and regulations, the State Board does not hear additional testimony. Its review is limited to determining whether substantial evidence exists in the record to support the decision of the local board. The regulations also specifically proscribe the State Board from substituting its judgment for that of the local board if there is substantial evidence in the record to support the

---

1. 29 *Del.C.* § 10142 provides:

 (a) Any party against whom a case decision has been decided may appeal such decision to the Court.

 (b) The appeal shall be filed within 30 days of the day the notice of the decision was mailed.

 (c) The appeal shall be on the record without a trial de novo. If the Court determines that the record is insufficient for its review, it shall remand the case to the agency for further proceedings on the record.

 (d) *The Court, when factual determinations are at issue, shall take due account of the experience and specialized competence of the agency and of the purposes of the basic law under which the agency has acted.* The Court's review, in the absence of actual fraud, shall be limited to a determination of whether the agency's decision was supported by substantial evidence on the record before the agency.

2. 14 *Del.C.* § 1058 provides:

 **Controversies concerning rules and regulations of the school board.**

 The school board of each reorganized school district shall decide on all controversies involving the rules and regulations of the school board. Any party to such controversy who feels aggrieved by a decision of a school board may appeal to the State Board of Education by setting forth such grievance in a petition which shall be served by certified or registered mail within 30 days after receiving notice of the decision upon the State Superintendent of Public Instruction. The State Board of Education shall by rules and regulations provide for adequate procedures for the hearing of any such petitions and shall decide the controversy. The decision of the State Board of Education shall be final.

decision of the local board. Finally, the State Board uses a *de novo* standard with respect to questions of law.[3] *See generally Board of Education of the New Castle County Vocational Technical School District v. Clark*, Del.Super., C.A. No. 86A–MR–13, 1988 WL 47096 Gebelein, J. (May 3, 1988) (State Board procedures limit appellate review to the record below). Having adopted these self-limiting rules and regulations, the State Board must apply them uniformly to every appeal before it as a matter of administrative law. *Morton v. Ruiz*, 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974); *Brandywine Affiliate NCCEA/DSEA v. Board of Education of the Brandywine School District*, 555 F.Supp. 852, 863–64 (D.Del.1983) (discussing arbitrariness doctrine).

In this case, however, it is apparent that the State Board reviewed the record and made its own findings of fact without the benefit of testimony. Although some of the State Board's findings reiterated portions of findings made by the hearing officer, other findings of the hearing officer were either ignored or contradicted by new findings of fact made by the State Board. The State Board further characterized certain grounds for termination as "pretextual."[4]

The first legal issue before this Court is not whether the State Board's findings are supported by substantial evidence, as urged by Dr. DiNunzio. Rather, it is whether the State Board erred as a matter of law when it made findings of fact for purposes of the appeal before it. Because the State Board's regulation precluded it from making its own findings of fact, the State Board committed legal error when it did so.

Having determined that the State Board exceeded its scope of review of the facts, the issue remains whether the State Board was nonetheless correct when it found that the decision of the Smyrna Board was unsupported by substantial evidence, arbitrary and capricious, and incorrect as a matter of law. If the State Board was correct in its ultimate conclusion, then its legal error of fact-finding on appeal would be harmless. *See* 2 Am.Jur.2d *Administrative Law* § 350, at 163 (1962) ("Under some circumstances a failure to observe regulations may be regarded as harmless error.") In order for this Court to determine if the ultimate conclusion of the State Board was correct as a matter of law, I must independently examine the record before the Smyrna Board.[5]

---

**3.** The relevant portions of the regulation that governs the State Board's scope of review follow:

> III. *Procedure on Appeal*
>
> (a) The appellate review by the State Board shall be limited to the record below (local board). The State Board will not hear testimony on the decision appealed. The "substantial evidence" rule will be applied; that is, the State Board will not substitute its judgment for that of the local board if there is substantial evidence in the record for its decision. The State Board will make independent judgments with respect to questions of law.
> 
> \* \* \* \* \* \*
>
> (b) The State Board shall consider the appeal record, statement of position and supporting legal briefs in reaching its decision. Any party may request oral argument before the State Board at the meeting at which the appeal is scheduled to be considered by notifying the State Superintendent and the other party at the time the required statement of position is filed. There will be no oral argument unless it is requested at that time.
>
> (c) The Board after considering the record presented and arguments made by the parties

to any appeal shall reach a decision and inform the parties in writing of the decision. This regulation was last adopted in 1977.

**4.** A finding by an administrative agency that particular grounds for termination were "pretextual" is clearly a factual finding. *Compare DuPont Country Club v. Delaware Department of Labor, Rizzo*, Del.Super., No. 87A–MY–16, 1988 WL 67832 Gebelein, J. (Memorandum Opinion) (June 24, 1988).

**5.** This method of review is identical to that employed by the Supreme Court when it reviews a decision of the Superior Court that, in turn, reviewed the decision of an administrative agency. The second appellate body looks through the first appellate body and determines whether substantial evidence supports the decision of the agency that originally heard the evidence. If the decision is supported by substantial evidence and free of legal error, it must be upheld. *Compare Board of Education v. Shockley*, Del.Supr., 155 A.2d 323 (1959); *Reynolds v. Continental Can Co.*, Del.Supr., 240 A.2d 135 (1968).

## B. The Substantial–Evidence Issue

■ Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Board of Education v. Shockley*, Del. Supr., 155 A.2d 323, 327 (1959). It is more than a scintilla but less than a preponderance of the evidence. *DiFilippo v. Beck*, 567 F.Supp. 110 (D.Del.1983). Here, the Court is satisfied from a review of the voluminous record in this case that satisfactory proof was presented to support the findings made by the hearing officer and adopted by the Smyrna Board.

## C. The Good-and-Just-Cause Issue

Dr. DiNunzio could not lawfully be fired without good and just cause ("good cause"). Although the definition of good cause in this context has not been addressed by Delaware courts, a review of caselaw involving terminations of school personnel under the same or similar requirements reveals that the term is broadly defined. For example, good cause has been defined as "any ground which is put forward by the committee in good faith which is not arbitrary, unreasonable, or irrelevant to the committee's task of building up and maintaining an efficient school system." *School Committee of Foxborough v. Koski*, 8 Mass.App. 870, 391 N.E.2d 708, 709 (1979). Similarly, the court in *Work v. Mt. Abraham Union High School Board*, Supr., 145 Vt. 94, 483 A.2d 258, 259 (1984), noted that "[j]ust cause means some substantial shortcoming detrimental to the employer's interests which the law and sound public opinion recognize as a good cause for dismissal."

In deciding a case involving the termination of a principal, the court in *Briggs v. Board of Directors of the Hinton Community School District*, Iowa Supr., 282 N.W.2d 740 (1979), noted that:

'just cause' or 'good cause' cannot be reduced to a legal certainty.... Generally, the focus is on the ability and fitness of the employee to discharge the duties of his or her position, and the legislative purpose to protect the public against incompetent teachers and administrators, to assure proper educational qualifications, and to maintain high standards of performance.

*Id.* at 742 (citations omitted).

When the termination of a superintendent of schools was under review in *Wedergren v. Board of Directors*, Iowa Supr., 307 N.W.2d 12 (1981), the court acknowledged "the flexible nature of just cause and realized that each case 'depends on its own circumstances.'" The *Wedergren* court held that:

The term includes professional incompetence and other faults attributable to the employee. It means conduct which directly or indirectly significantly and adversely affects what must be the ultimate goal of every school system: high quality education for the district's students. It relates to job performance including leadership and role model effectiveness. It must include the concept that a school district is not married to mediocrity but may dismiss personnel for neither performing high quality work nor improving in performance.

*Id.* at 20 (citations omitted).

■ While good cause may not be susceptible to a precise definition, the alleged grounds in each discharge case must be related to the administrator's personal competence. *Delagorges v. Board of Education*, 176 Conn. 630, 410 A.2d 461, 465 (1979). A perceived need or fear by the school board's constituency cannot constitute good cause. *See id.* 410 A.2d at 465; *Wright v. Superintending School Commission*, Me.Supr., 331 A.2d 640, 643 (1975). To hold otherwise would subject a school administrator's continued employment to factors outside his personal control and not related to his personal conduct, including the vagaries of public opinion.

■ For these reasons, the Smyrna Board's belief that Dr. DiNunzio's discharge was required to restore the community's confidence and to pass a tax referendum cannot be considered in determining good cause. A perceived belief of the community is not in itself evidence of incompetence, and Dr. DiNunzio's job responsibil-

ities did not include guaranteeing that tax referendums would pass. The Smyrna Board's reliance on these factors was error, and the State Board was correct in so ruling.

This legal determination does not end the inquiry, because the hearing officer stated other grounds that he concluded supported a finding of good cause. These findings include references to incidents that occurred before the Smyrna Board renewed Dr. DiNunzio's contract in December 1987. Dr. DiNunzio argues that the hearing officer should not have considered pre-contract renewal events in determining the existence of good cause. The State Board also discounted pre-contract renewal events and focused upon the sufficiency of events in January 1988 to support a finding of good cause.

 The hearing officer was correct to consider pre-contract renewal events relevant to Dr. DiNunzio's present ability and fitness to perform his contract. *Compare Leach v. Board of Education of New Castle County Vocational–Technical School District*, Del.Super., 295 A.2d 582 (1972); *Mack v. Kent County Vocational–Technical School District*, Del.Super., C.A. No. 86A–AU–2, 1987 WL 11466 Bush, J. (May 20, 1987). As stated in *Redcay v. Board of Education*, N.J.Supr., 33 A.2d 120 (1943):

> Unfitness for a task is best shown by numerous incidents. Unfitness for a position under the school system is best evidenced by a series of incidents. Unfitness to hold a post might be shown by one incident, if sufficiently flagrant, but it might also be shown by many incidents. Fitness may be shown either way.

*Id.* at 121.

 The hearing officer made several specific findings dealing with Dr. DiNunzio's failure to handle the school's budgetary and fiscal affairs properly. Moreover, there is substantial evidence in the record to support the Smyrna Board's conclusion that Dr. DiNunzio lacked the ability to lead the school district out of its financial morass. Notwithstanding repeated admonitions to improve fiscal planning, budgetary

development, and budgetary interpretation, the fiscal year 1988 deficit was substantially in excess of what was expected. There is substantial evidence in the record that this deficit growth was significant to the school district, and it clearly reflected Dr. DiNunzio's inability to properly supervise the school district's budgetary and fiscal affairs. The superintendent's inability or unfitness to properly manage the finances of the school district constituted a substantial shortcoming detrimental to his employer's interests under these circumstances. *Work*, 483 A.2d 258; *Briggs*, 282 N.W.2d 740; *Wedergren*, 307 N.W.2d 12. Thus, the hearing officer's conclusion that there was good cause for the termination of the contract was free of reversible legal error. The State Board erred as a matter of law when it held otherwise.

### VI. Conclusion

For the above reasons, the decision of the State Board of Education is REVERSED, and this case is REMANDED with the instruction to affirm the decision of the Board of Education of the Smyrna School District terminating the employment of Dr. John DiNunzio for good and just cause.