LEHMAN BROTHERS BANK, FSB,
Appellant Below, Appellant

v.

STATE BANK COMMISSIONER,
Appellee Below, Appellee.

No. 656, 2006.

Supreme Court of Delaware.

Submitted: May 23, 2007.
Decided: Nov. 7, 2007.
Modified: Nov. 9, 2007.

Stanford L. Stevenson, III and Anne Shea Gaza of Richards, Layton & Finger, Wilmington; Paul H. Frankel (argued) and Irwin M. Slomka of Morrison & Foerster, LLP, New York City, of counsel, for Appellant.

Thomas P. McGonigle of Wolf, Block, Schorr and Solis–Cohen, LLP, Wilmington; Joseph C. Bright (argued) and Cheryl A. Upham of Wolf, Block, Schorr and Solis–Cohen, LLP, Philadelphia, PA, of counsel, for Appellee.

Before HOLLAND, JACOBS and RIDGELY, Justices.

JACOBS, Justice:

Appellant Lehman Brothers Bank, FSB appeals from a Superior Court Order [1] affirming a decision by the State Bank Commissioner (the "Commissioner") [2] assessing additional franchise tax and penalties against the Bank for the tax years 2000, 2001, 2002 and 2003. We affirm that portion of the Order upholding the imposition of additional franchise tax, reverse that portion upholding the assessment of penalties, and remand the case for further proceedings.

## FACTS AND PROCEDURAL BACKGROUND

The material facts are undisputed. Since the 1980s, Lehman Brothers Holdings, Inc. ("LBH") has operated a mortgage business whose activities consist of acquiring, and earning interest on, mortgages issued by independent mortgage lenders and brokers or by LBH's subsidiary mortgage company, Aurora Loan Services, Inc. ("Aurora"). Before 1999, LBH's mortgage business was funded by unsecured bank loans, commercial paper, or short and long-term repurchase agreements. Because this type of funding was unstable, LBH actively sought to acquire a federal savings bank, specifically to gain access to Federal Home Loan Bank ("FHLB") funding, which was a more stable and efficient funding source.

In 1999, LBH acquired Delaware Savings Bank, FSB, a federal savings bank organized under the Federal Home Owner's Loan Act, and subject to regulation and supervision by the United States Office of Thrift Supervision, and changed its name to Lehman Brothers Bank, FSB (the "Bank"). The Bank's federal stock charter, which became effective on June 30, 1999, designated Wilmington, Delaware as the Bank's "home office." That designation enabled the Bank to access FHLB funds from the Pittsburgh FHLB.

The Bank maintained a retail banking office—located in Wilmington, Delaware—for personal banking services. That retail operation was not profitable. The Bank's profitable operation was its mortgage

---

**1.** *Lehman Bros. Bank, FSB v. State Bank Commissioner,* 2006 WL 3457649 (Del.Super.) (cited herein as "Super. Ct. Op.").

**2.** Decision of the Delaware State Bank Commissioner, dated May 20, 2005 (cited herein as "Comm. Dec."). Any references in this Opinion to the Commissioner are to the office of the Commissioner, not to the particular occupant of that office.

banking business.[3] In that latter business, the Bank had two primary sources of funds for acquiring mortgages: (i) funds derived from sales of certificates of deposit (representing 25–30% of the total funds) and (ii) funds derived from FHLB loans (representing 50–60% of the total). Using those funds, the Bank acquired mortgages in one of three ways: outright purchase,[4] direct origination,[5] and origination through a correspondent lender.[6] The Bank customarily held the mortgages for 45–60 days—a practice generating interest income that represented about 97% of the Bank's total income. After 45–60 days, the Bank then "sold" the mortgages to its parent company, LBH, making no profit on the transfer.

Most of the Bank's senior management was based in New York, and the Bank's board of directors met approximately eight times a year in New York. For the tax years in question, about 12 persons were employed at the Delaware home office. Half of the Delaware employees engaged in retail banking activities, and half performed accounting and other support services for the Bank as a whole. To conduct its mortgage banking business, the Bank employed 20–25 full-time direct employees in New York (all on the Bank's payroll), 66 "dual employees" in New York (persons on LBH's payroll, for whose services the Bank reimbursed LBH), and 24 "dual employees" in Colorado (persons on Aurora's payroll, but for whose services the Bank reimbursed Aurora).

For each of the years at issue (2000–2003) the Bank filed a Delaware Franchise Tax Report. Delaware imposes a bank franchise tax on the taxable income of banking organizations for the privilege of doing business in this State.[7] The measure of the franchise tax depends importantly on whether the banking organization (here, a federal savings bank) is domiciled in Delaware.[8] Under 5 *Del. C.* § 1101(a) ("subsection (a)"), a federal savings bank with its "principal office" in Delaware is taxed on all its taxable income.[9] But, under line 4(b) of its Return, a bank may deduct from its reported income the portion that was earned from activities conducted outside Delaware by branches or subsidiaries subject to income taxation under the laws of another state (a "line 4(b) deduction").[10] Under 5 *Del. C.* § 1101(b) ("subsection (b)"), a federal savings bank not "headquartered" in Delaware is subject to a more limited bank franchise tax, imposed only on the income of the bank's Delaware branches or subsidiaries, if any. The Delaware bank franchise tax statute does not define the terms

---

3. In addition to its retail and mortgage banking activities, the Bank conducted a trust services operation, beginning in 2002.

4. The Bank bought residential mortgage pools that were already issued and funded.

5. A borrower who wanted a mortgage would apply to Aurora, which would approve the borrower's credit and the mortgage under the Bank's guidelines. Aurora's services were usually performed in Colorado.

6. Another lender would underwrite and fund the loan and would then sell the mortgage to the Bank, through Aurora.

7. *See* Super. Ct. Op. at *4.

8. *See* 5 *Del. C.* § 1101.

9. 5 *Del. C.* § 1101(a) and 5 *Del. C.* § 101(4)(b).

10. Under Section 1101(a)(1)(b)(2), a Delaware bank with out-of-state branches and subsidiaries may reduce its "taxable income" by "[t]hat portion of the net operating income before taxes, verifiable by documentary evidence ... which is ... [d]erived from business activities carried on outside [Delaware] and subject to income taxation under the laws of another state."

"principal office" or "headquartered." For ease of reference, we sometimes refer to either of those terms, or both interchangeably, as "domicile," or "domiciled."

For the year 2000, the Bank filed its Franchise Tax Return under subsection (a), as had its predecessor (the Delaware Savings Bank), as a banking organization having its "principal office" in Delaware. For that tax year, the Bank reported all its income, but claimed a line 4(b) deduction to reflect its income from activities conducted outside Delaware, even though the Bank had no formally established out-of-state branches or subsidiaries. The Commissioner's office made no objection to the Bank's 2000 Franchise Tax Return for nearly three years.

The Bank used the same approach in filing its Franchise Tax Return for the tax year 2001. The Bank filed its 2001 Return (in 2002) under subsection (a), as a banking organization having its "principal office" in Delaware, and again claimed a line 4(b) deduction. Thereafter, the Commissioner contacted the Bank to discuss the Return. During those discussions, the Commissioner requested, among other things, documentation to support the line 4(b) deduction. The statute allowing that deduction authorizes the taxpayer to deduct "net operating income before taxes *verifiable by documentary evidence* from any subsidiary or ... branch."[11] In response to that request, the Bank submitted, in March 2003, two "apportionment schedules," consisting of one-page charts listing income purportedly allocated and reported to other states.

In 2003, the Bank filed its 2002 Franchise Tax Return, again under subsection (a), and again claiming a line 4(b) deduction. By letter dated October 6, 2003, the Commissioner advised the Bank that its Returns for the tax years 2000–2002 were incorrect, because (in the Commissioner's view) the Bank had no basis to claim a line 4(b) deduction. The Commissioner then recalculated the Bank's tax liability based on the disallowance of the line 4(b) deduction, and also assessed "late penalties." The Bank disputed both the assessment and the penalties. That dispute prompted the Commissioner to issue a notice of proceedings under 29 *Del. C.* § 10122 for purposes of finally determining the Bank's franchise tax liability for tax years 2000, 2001, and 2002.

In response to the Commissioner's disallowance of the line 4(b) deduction in its 2000–2002 Returns, the Bank did not claim that deduction in its 2003 Franchise Tax Return (filed in 2004). The Bank filed its 2003 Return under subsection (a)—as before—but instead of claiming a line 4(b) deduction, the Bank reported only that portion of its income it claimed to be attributable to Delaware.[12] On August 2, 2004, the Commissioner issued a revised notice of proceedings, this time covering the Bank's franchise tax liability for all four years in question, *i.e.* 2000–2002 and 2003. An evidentiary hearing before the Commissioner was scheduled for September 30 and October 1, 2004.

After it received the Commissioner's August 2, 2004 notice, the Bank submitted amended Franchise Tax Returns for all four tax years. The basis for the amended Returns was that, for all the years at issue, the Bank was not domiciled in Delaware, contrary to what the Bank had represented in its original Returns.

---

**11.** 5 *Del. Admin. C.* § 1105, Item 4(b), based on 5 *Del. C.* § 1101(a)(1)(b)(2) (emphasis added).

**12.** The income reported on the 2003 Franchise Tax Return was, therefore, significantly less than the amounts reported on the Tax Returns filed for the previous three years.

Therefore, the Bank should be taxed under subsection (b), only on the income earned from its Delaware operations. In submitting those amended Returns, the Bank reported that it used a separate accounting method, based on a study prepared by Ernst & Young, to segregate the income generated by the Bank's Delaware retail operations from the income generated by the Bank's "nationwide" mortgage and trust operations. Based on that accounting method, the Bank claimed that it was entitled to tax refunds for all four years, totaling approximately $14 million.

After the evidentiary hearing, the Commissioner determined that because the Bank was domiciled in Delaware, subsection (a) of Section 1101 was applicable. The Commissioner further decided that the Bank was not entitled to claim a line 4(b) deduction, because it had no out-of-state "branches" or "subsidiaries." Therefore, the Commissioner concluded that a franchise tax balance of $10.5 million was due, and assessed "late penalties" for each tax year, at a daily rate of 0.05% of the balance, to accrue at the same rate until the additional assessed tax was paid.[13] The "late penalties" imposed from March 1, 2001 (the due date for the 2000 tax) to May 20, 2005 (the date of the Commissioner's decision) totaled approximately $4 million.[14]

The Bank appealed to the Superior Court, which upheld the Commissioner's decision. The Superior Court held that: (i) the Bank was domiciled in Delaware for franchise tax purposes; (ii) all of the Bank's interest income was earned in, and derived from, Delaware; (iii) the Commissioner's method of assessing the tax did not violate the Commerce or the Due Process Clauses of the United States Constitution; and (iv) the Commissioner did not abuse its discretion by refusing to abate the tax assessment and the penalties.

This appeal followed.

### THE CLAIMS OF ERROR: AN OVERVIEW

On appeal, the Bank advances several claims of error. The Bank first claims that the Commissioner and the Superior Court reversibly erred by concluding that the Bank was domiciled in Delaware and, thus, subject to Section 1101(a). The Bank takes the position that it was (and is) domiciled in New York, because most of the Bank's employees, including its senior management, work in New York. Therefore, the Bank claims, the applicable franchise tax provision is not Section 1101(a), but Section 1101(b), under which only the income attributable to a Delaware "branch" is subject to tax.

Second, and alternatively, the Bank argues that even if Section 1101(a) is the applicable statute, the Commissioner and the Superior Court reversibly erred in holding that the Bank was subject to Delaware bank franchise tax on 100% of its income. That was error, the Bank contends, because (i) the Bank did not earn all of its income in Delaware, and (ii) the

---

13. *See* Comm. Dec. pp. 17–21. The total assessment of $14,515,474 was divided as follows: (1) for 2000: $3,209,996 franchise tax assessed; $854,996 balance due; $658,778 penalty; (2) for 2001: $4,936,270 franchise tax assessed; $1,726,410 balance due; $1,015,123 penalty; (3) for 2002: $7,715,354 franchise tax assessed; $3,144,482 balance due; $1,275,087 penalty; and (4) for 2003: $11,577,586 franchise tax assessed; $4,777,586 balance due; $1,063,012 penalty.

14. Because the Bank has not paid the additional tax assessed, the aggregate penalties have increased to approximately $7.8 million as of the date of oral argument before this Court.

statutorily prescribed manner of assessing the tax violates the Commerce and the Due Process Clauses.

Third, the Bank claims that the Superior Court reversibly erred in finding that the Commissioner properly refused to abate the penalties. Fourth, the Bank argues that if this Court finds that the Bank is entitled to a tax refund, the Bank is entitled to pre-judgment interest on that refund. These claims generate the issues presented on this appeal.

The first issue is whether the Bank is domiciled in Delaware. If the Bank is *not* domiciled in Delaware, then Section 1101(b) applies and the Bank's amended Franchise Tax Returns—filed under Section 1101(b)—were correct, thereby entitling the Bank to a tax refund. If, however, the Bank is domiciled in Delaware, then the Bank is subject to Section 1101(a), in which case the question becomes whether the Bank was entitled to a line 4(b) deduction. We conclude that the Bank was domiciled in Delaware, and that under the applicable statute—Section 1101(a)—the Bank was not entitled to apportion its income by taking a line 4(b) deduction.

The next set of issues involve whether the Delaware bank franchise tax statute violates the Commerce and/or the Due Process Clause. We hold that the apportionment mechanism contained in the Delaware statute (which is not available to the Bank in this case) passes constitutional muster under the Commerce and the Due Process Clauses.

The final issue is whether the Commissioner abused its discretion by refusing to abate the penalties assessed. We conclude that in these specific circumstances the Commissioner abused its discretion by not abating the penalties and that the Superior Court erred in holding otherwise.

## STANDARD OF REVIEW AND ANALYSIS OF THE CLAIMS OF ERROR

 In reviewing an administrative agency's decision, this Court determines whether the factual findings of the agency are "supported by substantial evidence on the record before the agency."[15] Where, as here, the agency has interpreted and applied statutory provisions, those determinations involve questions of law[16] that this Court reviews *de novo.*[17]

### Section 1101(a) Is Applicable Because The Bank Was Domiciled in Delaware

Section 1101(a) of the bank franchise tax statute applies to federal savings banks having their "principal office" in Delaware. Section 1101(b) applies to federal savings banks that are not "headquartered" in Delaware. From the structure of Section 1101, it is evident that the terms "principal office" and "headquarter[s]" are used interchangeably.[18] Neither term is defined

**15.** *Public Water Supply Co. v. DiPasquale,* 735 A.2d 378, 380–81 (Del.1999) (citing *Stoltz Mgmt. Co., Inc. v. Consumer Affairs Bd.,* 616 A.2d 1205, 1208 (Del.1992)).

**16.** *Hubbard v. Hibbard Brown & Co.,* 633 A.2d 345, 349 (Del.1993); *Bd. of Educ. of Smyrna School Dist. v. DiNunzio,* 602 A.2d 85, 92–93 (Del.Super.1990); *Public Water,* 735 A.2d at 380–81.

**17.** *Del. Bay Surgical Serv., P.C. v. Swier,* 900 A.2d 646, 652 (Del.2006) (citing *Coastal Barge*

*Corp. v. Coastal Zone Ind. Control Bd.,* 492 A.2d 1242, 1246 (Del.1985)).

**18.** *See Chrysler Corp. v. State,* 163 A.2d 239, 241 (Del.1960) (holding that where similar terms are used in different subsections of the same provision, those terms should be construed to have the same meaning). The Report on "State and Local 'Doing Business' Taxes on Out–of–State Financial Depositories" of the United States Advisory Commission on Intergovernmental Relations, dated

in Chapter 5 (Banking) of the Delaware Code, of which Section 1101 is a part. This Court must therefore ascertain the meaning of those terms, which requires us to interpret the Delaware bank franchise tax statute, as applied to a federal savings bank.

■ The Bank argues that in interpreting the statute, the terms "principal office" and "headquarter[s]" must be given their ordinary meaning. According to the Bank, the ordinary meaning is "commercial domicile," defined as "the place from which the trade or business is principally managed or directed." [19] Under that definition the Bank's "commercial domicile" would be New York, because the Bank's executive officers are employed in New York, its board of directors meets exclusively in New York, its regulatory examinations are conducted in New York, and most of its mortgage-related decisions are made in New York.

■ We disagree with the Bank's interpretation. The rule of construction which requires that an undefined statutory term

be given its ordinary meaning does not apply to terms of art. Under the general rules of statutory interpretation set forth in the Delaware Code, "technical words and phrases ... [must] be construed and understood according to [their] peculiar and appropriate meaning." [20] Here, the terms "principal office" and "headquarter[s]" are terms of art and, therefore, must be given their "peculiar and appropriate meaning." Because those terms are used in a statute imposing a tax upon "banking organizations"—entities that include federal savings banks—we conclude that the appropriate meaning of "principal office" and "headquarter[s]" is the meaning accorded those terms by the regulations that govern federal savings banks and their taxation.

The Code of Federal Regulations (CFR) [21] requires that all federal savings banks designate a "home office." [22] Under the CFR, "home office" is synonymous with "principal office." The latter term is employed in Section 1101 of the Delaware statute.[23] Here, the Bank's federal stock

---

May 1975 (the "ACIR Report") recognizes that the terms "domicile," "principal office," "home office," and "headquarters" are synonymous. *See* ACIR Report, p. 53.

**19.** The "ordinary meaning" definitions suggested by the Bank are extracted either from dictionaries or from regulations that are not applicable in Delaware: the Uniform Division of Income for Tax Purposes Act (UDITPA) and a Model Statute adopted by the Multistate Tax Commission (MTC). Delaware has not adopted the UDITPA and is not a member of the MTC.

**20.** 1 *Del. C.* § 303. *See also Shell Petroleum, Inc. v. U.S.*, 182 F.3d 212, 217–18 (3rd Cir. 1999) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 202, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974)).

**21.** This Court has used federal definitions when a Delaware tax statute did not clearly define a term. *See Director of Revenue v. CNA Holdings, Inc.*, 818 A.2d 953, 957–59 (Del.

2003). Several provisions in Chapter 30 (Taxation) of the Delaware Code actually require that certain statutory terms be given the same meaning as when used in federal laws. *See, e.g.,* 30 *Del. C.* § 502(a), § 1101, § 2071. *See also Gow v. Director of Revenue,* 556 A.2d 190, 193 (Del.1989).

**22.** *See* 12 C.F.R. § 545.91(a) which provides that "[a]ll operations of a Federal savings association are subject to direction from the home office."

**23.** *See* 12 C.F.R. § 561.39 ("The term principal office means the home office of a savings association established as such in conformity with the laws under which the savings association is organized.") *See also* 12 C.F.R. § 925.18(b) ("the principal place of business ... is the state in which the institution maintains its home office.")

charter explicitly designates Wilmington, Delaware as the "home office." The CFR further mandates that if a federal bank wishes to change its home office address, it must apply to the United States Office of Thrift Supervision ("OTS").[24] The Bank has never applied to the OTS to change the location of its Wilmington, Delaware home office. Therefore, under the CFR, the Bank is domiciled in Delaware.

Other applicable regulations lead to the same conclusion. 12 U.S.C. § 1424(b) prescribes that a federal savings bank "may become a member *only* of, or secure advances from, the Federal Home Loan Bank of the district in which is located the institution's *principal place of business.*"[25] Here, the Bank borrowed exclusively from the FHLB in Pittsburgh, which serves Delaware—but not New York—federal savings banks. We regard this course of conduct as evidence that the Bank considered its "principal place of business" to be Delaware, not New York.

The Delaware bank franchise tax statute also points to the conclusion that the Bank is domiciled in Delaware. Although that statute does not define "principal office" and "headquarter[s]," it does define a similar term—"located"—that appears in *both* subsections of Section 1101.[26] Under 5 *Del. C.* § 831(8), a savings institution is "located" in "the state in which the amount of aggregate deposits of all its offices in that state is greatest."[27] The Bank had only one office where its deposit operations were conducted. That office was located in Delaware.

Finally, we note a recent amendment to the Delaware bank franchise law that defines, for the first time, the term "headquarters." Under the new provision, the "headquarters" of a national banking association are located "in the state of the bank's *home office* as designated in its charter."[28] Although that amendment is effective for tax years post–2006 (and, thus, not applicable here), the definition it adopts is instructive and fully supports the interpretation reached here.[29]

For these reasons, we conclude that both the Commissioner and the Superior Court correctly held that the Bank was domiciled in Delaware for franchise tax purposes. As a consequence, Section 1101(a) was the applicable provision for computing the Delaware bank franchise tax.

### The Bank Is Not Entitled To A Line 4(b) Deduction Under Section 1101(a)

Under Section 1101(a), the entire net income of federal savings bank domiciled in Delaware is taxed by Delaware, unless that entity has an out-of-state "branch" or "subsidiary." In that case, the income attributable to the branch or

---

**24.** *See* 12 C.F.R. § 545.91(b).

**25.** 12 U.S.C. § 1424(b) (emphasis added).

**26.** Section 1101 cross-references Section 801(5) for the definition of the word "located." Section 801(5) provides that a bank is "located" in Delaware if the "organization certificate identifies an address in [Delaware] as the place at which its discount and deposit operations are to be carried out." That definition is applicable to state-chartered banks and national banks. However, a similar definition, specifically applicable to savings institutions, is contained in Section 831(8).

**27.** 5 *Del. C.* § 831(8).

**28.** *See* 5 *Del. C.* § 1101A(c)(9) (emphasis added). National banks are subject to regulations which are very similar to those governing federal savings banks.

**29.** *See Chrysler Corp. v. State,* 163 A.2d 239, 241 (Del.1960) ("A change in the phraseology of the amendment creates a presumption that the Legislature intended a change of meaning.")

subsidiary may be deducted from the total reported income, subject to certain limitations. For a line 4(b) deduction to be available, however, the income sought to be excluded must be: (a) derived from business activities carried in other states through "branches" or "subsidiaries," (b) "verifiable by documentary evidence," and (c) subject to income taxation under the laws of another state.[30] The Superior Court and the Commissioner held that the Bank did not satisfy these conditions. We uphold their determination.

Regarding the first condition, it is undisputed that the OTS must approve the establishment of "branches" and "subsidiaries,"[31] and that during the years in question the Bank had no OTS-approved branches or subsidiaries.[32] The Bank requested OTS' approval to open a branch in New Jersey (to be effective January 2004), but it never sought OTS' approval to establish a New York branch. Rather, the Bank applied only for approval of an "agency office" in New York, "solely to conduct trust activities." The distinction is significant, because "agency offices" are expressly excluded from the CFR definition of "branch."[33]

The Bank asserts, nonetheless, that for franchise tax purposes it had *de facto*

branches in the other states to which it "paid more than $106 million in state and local income taxes."[34] This argument has no legal force. Congress has decreed that any "branches" must be approved by the OTS. That requirement reflects a policy judgment that a branch is more than a verbal label—it is a geographical location where a monopoly activity may be lawfully conducted.[35] Because approval of a branch authorizes the taking of deposits and the making of loans by the branch exclusively at that particular location, there is no such thing as a *de facto* branch in the federally regulated banking industry.

Faced with this insurmountable legal obstacle, the Bank attempts to circumvent it by arguing that requiring a taxpayer bank to establish a formal branch to avail itself of the line 4(b) deduction "does not reflect modern banking practices." Under such "modern practices," the Bank asserts, certain mortgage banking related activities may be conducted without prior OTS approval, through an out-of-state "agency office." It is the case that federal savings banks are allowed, under federal law, to conduct limited activities through agency offices without OTS approval.[36] Even so,

---

**30.** See 5 *Del. C.* § 1101(a); 5 *Del. Admin. C.* § 1105, Item 4(b).

**31.** See 12 C.F.R. §§ 545.93(a), 559.3 and 559.11.

**32.** Until January 2004, the Bank had no out-of-state branches, and its only Delaware branch closed in December 2000. On August 6, 2003, the Bank applied to the OTS for approval to open a branch in New Jersey, which was granted, effective January 26, 2004. See Comm. Dec., p. 6.

**33.** "Any office *other than* [the] home office, *agency office*, administrative office, data processing office, or an electronic means or facility." See 12 C.F.R. § 545.92(a) (emphasis added).

**34.** This assertion is based on a report prepared by PricewaterhouseCoopers, which contains a one-page chart listing other states where the Bank paid taxes during the years at issue (*e.g.* New York, California and Colorado) and the amounts paid in each state.

**35.** Delaware regulations similarly make the opening of a branch by a state bank subject to the State Bank Commissioner's approval. A branch is defined as "any location ... at which deposits are received or checks paid or money lent." See 5 *Del. C.* § 770(a)(1).

**36.** See 12 C.F.R. § 545.96. Those activities are limited to "[s]ervicing, originating, or approving loans and contracts" and "managing or selling real estate."

this limited exception does not aid the Bank's position, because the Delaware bank franchise tax statute permits a line 4(b) deduction only on income earned by an out-of-state "branch" or "subsidiary," and, under federal law, an "agency office" is not a "branch." Accordingly, the Commissioner properly held that the absence of any OTS-approved branches or subsidiaries precludes the Bank from taking advantage of the line 4(b) deduction.

■ Even if we accepted the Bank's argument that an OTS-approved branch was not required to enable the Bank to take a line 4(b) deduction, other conditions for utilizing that deduction remain unsatisfied. First, the Bank failed to provide (either at the time of filing or after) "documentary evidence" verifying that the portion of the income it sought to exclude from the taxable income reported in Delaware was "derived from business activities carried in other States."[37] The only documents furnished by the Bank were "apportionment schedules" that listed the percentages of the Bank's total income that were "allocated" to other states. Those schedules did not explain how those percentages were calculated, and, moreover, covered only tax years 2000 and 2002, even though the Bank also claimed the line 4(b) deduction for tax year 2001. As the Superior Court noted, the Bank should have prepared "a separate Delaware balance sheet accounting for the money earned in Delaware."[38] Second, the Bank failed to prove that other states were taxing the line 4(b) deducted income. As the Superior Court found, the Bank did not establish whether the other states "taxed the same

mortgage interest income, or if they taxed other transactions, such as an origination fee or transfer fee."[39]

### The Bank Is Not Entitled To Any Other Apportionment

Having determined that the Bank was not entitled "to account for its out-of-state operations" by taking a line 4(b) deduction, we must decide whether the Bank was allowed to apportion its income in some different manner. The Bank claims that, to the extent the Delaware statute does not allow apportionment, the United States Constitution requires that result. Specifically, the Bank argues that the Commissioner and the Superior Court reversibly erred in holding that Delaware could tax 100% of the Bank's income because (i) in fact, the Bank did not earn all of its income in Delaware, and (ii) the tax assessed on that counterfactual basis violates the Commerce and the Due Process Clauses.

■ We initially dispose of the Bank's first argument. The Bank goes to great pains to argue that the activities which generated its mortgage-related funding and income "all took place outside Delaware, principally in New York." Both the Superior Court and the Commissioner determined, however, that "all [the Bank's] income was actually earned in and derived from sources in Delaware."[40] Under Delaware's taxation scheme, the *entire* net income of a federal savings bank having its home office in Delaware is taxed by Delaware, except for income attributable to

---

**37.** 5 *Del. C.* § 1101(a)(1)(b)(2); 5 *Del. Admin. C.* § 1105, Item 4(b).

**38.** Super. Ct. Op., at *7.

**39.** Super. Ct. Op., at *7. The only evidence produced by the Bank is the one-page chart included in the PricewaterhouseCoopers re-

port confirming the accuracy of Ernst & Young's analysis regarding the separate accounting method used in the amended Franchise Tax Returns.

**40.** Super. Ct. Op., at *6.

out-of-state branches or subsidiaries. Under that scheme, where the Bank's income was *in fact* earned is not a relevant inquiry, because the statute authorizes Delaware to tax the Bank's entire income.[41] To say it differently, to resolve the constitutional issues we need not determine what portion of the income was in fact earned in Delaware and what portion, if any, was in fact earned elsewhere.[42] Rather, the inquiry is whether Delaware's taxation scheme "reasonably" reflects the in-state component of the activity being taxed[43] (under the Commerce Clause) and whether there is a "rational" relationship between the taxed income and the values connected with the taxing state[44] (under the Due Process Clause). For the reasons next discussed, we conclude that Delaware's bank franchise tax statute passes muster under both constitutional provisions.

## A. Commerce Clause Analysis

The Commerce Clause authorizes Congress to "regulate Commerce ... among the several States."[45] Although the Commerce Clause is expressed as an "affirmative grant of power," the United States Supreme Court has consistently held that the Commerce Clause also contains a negative implication, known as the Dormant Commerce Clause, which prohibits certain state actions that interfere with interstate commerce.[46]

■ A taxpayer challenging a state taxation statute carries the burden of overcoming the presumption of constitutionality with clear and convincing evidence.[47] To determine a statute's constitutionality under the Dormant Commerce Clause, the United States Supreme Court has consistently applied the *Complete Auto Transit,*

41. *See* 5 *Del. C.* § 1101(a). Delaware's statutory scheme is in line with the recommendations of the ACIR Report on "State and Local 'Doing Business' Taxes on Out-of-State Financial Depositories" that where a financial depository is subject to franchise tax in more than one state, *"the domiciliary State (ordinarily the State of the principal, headquarters, or home office) may apply its tax on the entire income ...,* but shall allow ... a credit against such tax liability for similar taxes paid to other States." *See* ACIR Report, p. 53 (emphasis added).

42. In *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 273, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978), the United States Supreme Court noted that most apportionment formulas are imprecise and "will occasionally over-reflect or under-reflect income attributable to the taxing State."

43. *Goldberg v. Sweet,* 488 U.S. 252, 262, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). *See also Container Corp. of Am. v. Franchise Tax Bd.,* 463 U.S. 159, 169, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983) (holding that "the factor or factors used in the apportionment formula must actually reflect a reasonable sense of how income is generated").

44. *Moorman,* 437 U.S. at 273, 98 S.Ct. 2340 (1978) (citing *Norfolk & Western Ry. Co. v. Missouri State Tax Comm'n,* 390 U.S. 317, 325, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968)). *See also Quill Corp. v. North Dakota,* 504 U.S. 298, 305–06, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (quoting *Miller Brothers Co. v. Maryland,* 347 U.S. 340, 344-45, 74 S.Ct. 535, 98 L.Ed. 744, (1954)).

45. U.S. Const. Art. I, § 8, cl. 3.

46. *See, e.g., Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179–80, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995); *Quill Corp. v. North Dakota,* 504 U.S. 298, 309, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); *Northwestern States Portland Cement Co. v. Minnesota,* 358 U.S. 450, 458, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959).

47. *See Atlantis I Condo. Ass'n v. Bryson,* 403 A.2d 711, 714 (Del.1979); *Justice v. Gatchell,* 325 A.2d 97, 102 (Del.1974). In particular, a strong presumption of validity exists for the state taxing statutes. *See Kunkel's Estate v. U.S.,* 689 F.2d 408, 424 (3rd Cir.1982). *See also Estate of Kunze v. C.I.R.,* 233 F.3d 948, 954 (7th Cir.2000).

*Inc. v. Brady*[48] test. Under that test, a tax will be upheld if: (1) it is applied to an activity having a substantial nexus to the taxing state, (2) it is fairly apportioned, (3) it does not discriminate against interstate commerce, and (4) it is fairly related to the services provided by the taxing state.[49] The Bank's Commerce Clause claim is limited to the second prong of *Complete Auto.*[50]

Specifically, the Bank argues that the Delaware bank franchise tax is not fairly apportioned, because the statute does not allow a federal savings bank that is domiciled in Delaware and has no out-of-state branches to apportion its income to account for income-generating operations conducted in other states. The Commissioner responds that the *Complete Auto* test, and its fair apportionment requirement, are inapplicable in this case. Therefore, we must first address a threshold issue: whether *Complete Auto* is applicable at all. We conclude that it is.

### 1) *Complete Auto Is Applicable*

The Commissioner contends that the *Complete Auto* test established to implement the Dormant Commerce Clause does not apply here, for two reasons. First, the Commissioner argues, Congress affirmatively exercised its power to regulate interstate commerce in this area by enacting Section 1464(h) of the Federal Home Owner's Loan Act (HOLA). Therefore, the Commerce Clause is not "dormant" and

may not be used as a basis to attack the constitutionality of a Delaware statute adopted under the authority affirmatively delegated by the Congress to the states in Section 1464(h) of HOLA.

We conclude that the Dormant Commerce Clause is applicable. Section 1464(h) authorizes states to tax federal savings associations, but provides that such state taxes may not be "greater than that imposed ... on other similar local mutual or cooperative thrift and home financing institutions."[51] That is, Congress affirmatively exercised its power to regulate the interstate commerce only in a limited way, *i.e.* to prohibit discriminatory state taxation of federal savings associations. Congress did not, however, affirmatively legislate to regulate any other aspect of state taxation of federal savings associations. As the United States Supreme Court has held, "federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained."[52] Here, there is no "unmistakable" evidence that Congress intended affirmatively to regulate the entire field[53] of state taxation of federal savings banks. Therefore, Section 1646(h) of HOLA does not displace the Dormant Commerce Clause.

---

**48.** 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).

**49.** *See Complete Auto,* 430 U.S. at 279, 97 S.Ct. 1076.

**50.** The Bank does not dispute that the tax complies with *Complete Auto's* other three requirements. However, the Superior Court analyzed in detail all four prongs and concluded that each of them was satisfied. *See* Super. Ct. Op., at *9–10.

**51.** *See* 12 U.S.Code § 1464(h), enacted in 1933.

**52.** *Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 142, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963).

**53.** *See Southern Railway Co. v. Reid et al.,* 222 U.S. 424, 32 S.Ct. 140, 56 L.Ed. 257 (1912); *Lemke v. Farmers' Grain Co. of Embden,* 258 U.S. 50, 42 S.Ct. 244, 66 L.Ed. 458 (1922).

Second and alternatively, the Commissioner argues that even if the Dormant Commerce Clause applies *Complete Auto's* requirement of fair apportionment is limited to non-domiciliaries. Therefore, Delaware domiciliaries such as the Bank may be taxed without any apportionment restrictions. Stated differently, the Commissioner urges that "a state has the constitutional power to tax all of the income of its residents, no matter where that income is earned." [54]

■ The United States Supreme Court has not yet decided whether a state may constitutionally tax the *unapportioned* net income of a domiciliary entity that derives income from other states in which it conducts business. This issue was addressed, however, by the Supreme Court of Rhode Island in *Commercial Credit Consumer Services, Inc. v. Norberg.*[55] That case (*Commercial Credit*) involved a tax similar to the one at issue here, on banking institutions organized or incorporated under the laws of Rhode Island (the taxing state). The tax was computed on "net income" from any sources. The Rhode Island statute allowed no apportionment, but permitted the domiciliary to deduct its ordinary and necessary expenses of doing business from "gross income." Those deductible expenses included taxes paid to other states in which the domiciliary conducted business. Underscoring the novelty of the issue, the Rhode Island Supreme Court held that "modern doctrine . . . appears to permit, either under the commerce clause or the due process clause, a state to tax [local] *businesses engaged in interstate commerce* so long as the tax is applied to an activity that bears a substantial nexus to the taxing state, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the state", *i.e.* the *Complete Auto* requirements.[56] After conducting a *Complete Auto* analysis, the Court concluded that the Rhode Island tax satisfied the Commerce Clause.[57] The Court emphasized that it was a net-income tax[58] (as opposed to a gross receipts tax), that the statute allowed for deduction of taxes paid in other states, and that the taxpayer

---

54. Comm. Dec., at p. 15, citing *Oklahoma Tax Comm'n v. Chickasaw Nation,* 515 U.S. 450, 462–63, 115 S.Ct. 2214, 132 L.Ed.2d 400 (1995); *New York ex rel. Cohn v. Graves,* 300 U.S. 308, 313, 57 S.Ct. 466, 81 L.Ed. 666 (1937); *Lawrence v. State Tax Comm'n,* 286 U.S. 276, 52 S.Ct. 556, 76 L.Ed. 1102 (1932); *Chase Manhattan Bank v. Gavin,* 249 Conn. 172, 733 A.2d 782 (1999). Those cases dealt with various taxes imposed upon pure "locals" (either resident *individuals* or domestic *corporations*) whereas here we must determine whether a specific tax (the bank franchise tax) is applicable to a specific entity (a *federal savings bank* with its "home office" in Delaware but conducting multi-state operations).

55. 518 A.2d 1336, 1337 (R.I.1986).

56. *Id.* (citing *Complete Auto,* 430 U.S. at 279, 97 S.Ct. 1076) (emphasis added).

57. Contrary to what the Bank argues, it is irrelevant that Rhode Island amended its relevant statute in 1995 to permit banks to apportion their income. *See People v. Regelin,* 178 Mich.App. 128, 443 N.W.2d 436, 438 (1989). Moreover, the *Commercial Credit* ruling (*i.e.* that if the *Complete Auto* requirements are met, a State may tax the entire net income of a domestic entity which conducts all or some of its business out-of-state) was implicitly endorsed in *District of Columbia v. Chase Manhattan Bank,* 689 A.2d 539, 542–43 (D.C.App. 1997).

58. *See United States Glue Co. v. Oak Creek,* 247 U.S. 321, 38 S.Ct. 499, 62 L.Ed. 1135 (1918) (distinguishing between a tax upon gross receipts—more likely to impede or discourage the conduct of commerce—and a tax upon the net income, arising from whatever source, which would be constitutional if there is no discrimination against interstate commerce).

entity had failed to clearly show what taxes had been levied by other states.

Although the *Commercial Credit* case is not binding on us, we regard its conclusion—that *Complete Auto* is the appropriate analytical framework—as highly persuasive. Here, like in *Commercial Credit*, the Bank, although domiciled in the taxing state and having no out-of-state branches or subsidiaries, was nevertheless "engaged in interstate commerce."[59] By parity of reasoning, we conclude that the *Complete Auto* test controls the Commerce Clause analysis.

### 2) *Complete Auto's Fair Apportionment Requirement Is Satisfied*

We now reach the Bank's claim that the second prong of *Complete Auto* is not satisfied, because under the Delaware statute the tax is not fairly apportioned. The applicable Delaware bank franchise tax has a two-fold "structural" apportionment mechanism. First, a bank domiciled in Delaware would not be taxed on income attributable to (OTS-authorized) out-of-state branches or subsidiaries, to the extent that other states tax that portion of the income. Second, a bank not domiciled in Delaware would be taxed only on the income attributable to a Delaware branch or subsidiary.

The Bank first contends that, by amending the statute in 2006, the Delaware Legislature "recognized the constitutional infirmities of the existing regime." Under the 2006 amendment, a bank may choose to be taxed under the Section 1101 method (as occurred here) or under an alternative method established in Section 1101A (which was not available to the Bank for the tax years at issue). The alternative franchise tax is the sum of two components: (1) a tax on the "entire net income" that is apportioned to ·the state of Delaware, and (2) a location benefit tax "reflecting the value of utilizing Delaware's banking laws and bank system." The three factors used for apportionment are property, payroll, and receipts.[60]

We find no merit to the Bank's contention that the 2006 amendment exposes the constitutional infirmity of the pre-amendment scheme. Absent legislative history showing the contrary, a statutory amendment will not be regarded as indicative that the predecessor version was unconstitutional.[61] Here, the legislative history indicates that the purpose of the amendment was "to promote economic development"[62] in Delaware. There is no evidence of any purpose to correct any perceived unconstitutionality of the original version.

Under *Complete Auto's* second prong, a tax is fairly apportioned if it is internally and externally consistent.[63] Nowhere in

---

**59.** The purpose of the Commerce Clause is not "to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business." *See Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 182–83, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (citing *Western Live Stock v. Bureau of Revenue,* 303 U.S. 250, 254, 58 S.Ct. 546, 82 L.Ed. 823 (1938)).

**60.** See 5 *Del. C.* § 1101A.

**61.** *See People v. Regelin,* 178 Mich.App. 128, 443 N.W.2d 436, 438 (1989), where the court found that "reliance on the amendment [of a criminal statute] to support a conclusion that the Legislature recognized a constitutional infirmity in the existing statute" was "arguable."

**62.** *See* Synopsis of S.B. 249, 143rd Gen. Assem. (Del.2006).

**63.** *See Container Corp. of Am. v. Franchise Tax Board,* 463 U.S. 159, 169, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983); *Goldberg v. Sweet,* 488 U.S. 252, 261, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).

its briefs does the Bank dispute that the internal consistency test is met. The Superior Court held that the internal consistency test was satisfied because "[i]f every state's franchise tax included mortgage interest only when its banks held the mortgages, there would not be multiple taxation." [64] The Bank does not challenge this determination on appeal.

■ What the Bank claims is that the tax, as imposed, was not "externally consistent" because it was unapportioned and resulted in multiple taxation. The focus of the external consistency inquiry is upon the economic justification for the state's claim upon the value taxed.[65] That inquiry is whether the "factors used in the apportionment formula ... actually reflect a reasonable sense of how income is generated." [66] The Bank cites no cases addressing an apportionment system that is similar to that employed by the Delaware statute. The federal cases cited by the Bank [67] merely reiterate the undisputed and well-settled proposition that external consistency mandates that states tax "only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed." [68]

■ Delaware's apportionment system is "structural." That is, the bank franchise tax statute apportions income according to the banking entity's structure: home office, branches, and subsidiaries. Structural apportionment is peculiarly tailored to banks, which are heavily regulated entities. The activities that a bank may conduct are restricted, the places (branches, subsidiaries, agency offices) where a bank may conduct those activities are specified, and both are subject to a detailed system of regulatory accounting and financial control. The Bank argues that Delaware's structural apportionment system is flawed because the only permissible apportionment factor is the source of the income (*i.e.*, where the income was earned), not how the entity is structured or how the income is earned. None of Bank's cited authorities supports its proposition.[69] Apart from the requirement of reasonableness, the United States Supreme Court has expressly declined to impose constitutional constraints on a state's selection of a particular income allocation

64. Super. Ct. Op., at *9.

65. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 185, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).

66. *Container Corp.*, 463 U.S. at 169, 103 S.Ct. 2933.

67. *City of Modesto v. National Med., Inc.*, 128 Cal.App.4th 518, 27 Cal.Rptr.3d 215 (2005); *Philadelphia Eagles Football Club, Inc. v. City of Philadelphia*, 573 Pa. 189, 823 A.2d 108, 134 (2003); *Southern Pacific Transp. Co. Inc. v. State, Dept. of Revenue*, 202 Ariz. 326, 44 P.3d 1006 (Ct.App.2002); *City of Winchester v. Am. Woodmark Corp.*, 252 Va. 98, 471 S.E.2d 495, 498 (1996). Those cases analyze various (different) systems of apportionment, or lack thereof.

68. *Goldberg v. Sweet*, 488 U.S. 252, 261, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989).

69. The typical apportionment formula used in most states combines three factors: tangible property, payroll and sales. We observe that "tangible property" is an asset, "payroll" is an expense, and only the "sales" factor represents income (more precisely, gross income). If (as the Bank argues) only income—and its source—is an appropriate apportionment factor, then it seemingly follows that the apportionment formula employed by most states is unconstitutional. However, the United States Supreme Court has specifically approved the classical apportionment formula. *See Container Corp.* and *Barclays Bank PLC v. Franchise Tax Bd. of Cal.*, 512 U.S. 298, 114 S.Ct. 2268, 129 L.Ed.2d 244 (1994).

formula.[70] As the Commissioner observed, states have "wide latitude" in devising constitutionally sufficient methods of fairly apportioning the income.[71] Delaware's system need not be the only method of apportioning income, nor need it be the "best" method in the view of any particular taxpayer. The Constitution does not require that Delaware conform to the prevailing approach adopted by other states.[72] All that is required is that the system chosen be reasonable. In our view, that requirement is met here.

Taxing the Bank's entire net income "reasonably reflects the in-state component" of its activity, namely, that the funds generated by the Bank's domiciliation in Delaware "fueled [LBH's] entire mortgage banking business."[73] To acquire mortgages, the Bank had two primary funding sources: money generated by certificates of deposit sales and FHLB loans. The Bank held the mortgages purchased with those funds for 45 to 60 days, and the interest accumulated during that period generated almost 100% of the Bank's income.[74] The bank franchise tax is directed to that interest income, and only to that income. As the Superior Court correctly observed, *"Delaware did not tax any other transactions.* It did not tax the Bank's activities outside Delaware, such as Aurora's lending in Colorado. Nor did [Delaware] tax the loans and the interest income after they were moved from Delaware to New York."[75]

With respect to the first source of funding (certificates of deposit), LBH would not have had access to it without the Bank. Only a bank may accept deposits and issue certificates of deposit; therefore, the deposits were accepted at the Bank and the certificates were issued in the Bank's name. These operations all took place in Delaware. Attributing income generated by deposits to the place where a bank has its franchise to operate and is the only location at which deposits are accepted, is reasonable. The Bank's home office was in Wilmington, Delaware. The Bank's sole retail banking office, where all deposits were received, was established and staffed in Wilmington, Delaware. That the Bank had officers and employees at locations other than Wilmington does not weaken Delaware's "reasonable" economic justification for imposing the tax.

Regarding the second source of funding, only the Bank, not LBH, could (and did) receive FHLB loans. By virtue of being a Delaware-based federal savings associa-

---

**70.** *Moorman Mfg. Co. v. Bair,* 437 U.S. 267, 274, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978) (upholding a single-factor formula).

**71.** Comm. Dec., at p. 14.

**72.** In *Container Corp.* and *Barclays Bank,* the United States Supreme Court analyzed California's franchise tax, applied on an entity's "worldwide combined income." The plaintiffs claimed that a "separate accounting" method of apportionment—treating each corporate entity of a multi-state corporation separately for the tax purposes—should be employed rather than the three-factor apportionment classical formula. The Supreme Court upheld the classical formula, noting that California was not required no give up the allocation method chosen, where both methods presented "inescapable imprecision" and both "sometimes result[ed] in double taxation."

**73.** Super. Ct. Op., at *9. After LBH acquired the Bank, up to 90% of the funds for LBH's mortgage business came from the Bank. *See* Super. Ct. Op., at *2.

**74.** As one representative of the Bank testified "[W]e sent the money to Delaware because that's where ... our operating account was.... [I]t has to hit the books and records somewhere. It can't really hit your books and records in New York. It has to hit your books and records in the bank."

**75.** Super. Ct. Op., at *9 (emphasis added).

tion, the Bank was able to obtain loans from the Pittsburgh FHLB.

The Bank disputes this conclusion, arguing that LBH would have had access to federally insured deposits and FHLB loans (from Pittsburgh or elsewhere) if it acquired *any* federal savings bank, not necessarily one chartered in Delaware. But, LBH chose to acquire a Delaware bank, and that choice resulted in significant benefits: authorization to lend money outside the state in accordance with Delaware laws without regard to the other states' lending restrictions or usury laws; fire and police protection; access to courts; and access to schools, health care, and welfare benefits for the Bank's employees.[76] Those benefits are "reasonably" related to the Bank's presence in Delaware.

 The Bank next urges that the external consistency test is not satisfied because the Delaware bank franchise tax creates both threatened and actual multiple taxation. There is no constitutional prohibition against actual double taxation occasioned by two states having different apportionment systems.[77] In any event, the Bank's argument leads nowhere because the Superior Court found that the Bank had failed to prove by "clear and cogent evidence"[78] precisely what income (if any) was taxed by other states. As earlier explained, other than an unsupported one page document purporting to show that $106 million in tax was paid to other jurisdictions, nothing in the record establishes

actual multiple taxation or a significant threat thereof. Thus, the external consistency requirement is met here, because the structural apportionment framework of the Delaware bank franchise tax statute reasonably reflects and fairly measures the Delaware components of the Bank's "multi-state" business. Accordingly, Delaware's bank franchise tax does not violate the Dormant Commerce Clause.

### B. Due Process Clause Analysis

 The Bank also challenges the constitutionality of the Delaware bank franchise tax statute under the Due Process Clause of the Fourteenth Amendment. For a state to constitutionally tax income generated in interstate commerce, the Due Process Clause imposes two requirements: "a 'minimal connection' or 'nexus' between the interstate activities and the taxing state, and 'a rational relationship between the income attributed to the state and the intrastate values of the enterprise.' "[79] The Bank argues that Delaware's taxing of all the Bank's income violates Due Process because no rational relationship exists between the tax imposed by Delaware and the income taxed, which, the Bank urges, was earned from activities conducted outside of Delaware.

The United States Supreme Court has held that the requisite nexus between the interstate activities and the taxing state is established if the taxpayer avails itself of the "substantial privilege of carrying on

---

76. *See* Super. Ct. Op., at *10.

77. *See Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 277–78, 98 S.Ct. 2340, 57 L.Ed.2d 197 (1978); *Barclays Bank*, 512 U.S. at 318–19, 114 S.Ct. 2268 (citing *Container Corp.*, 463 U.S. at 187–89, 103 S.Ct. 2933).

78. *Moorman Mfg.*, 437 U.S. at 274, 98 S.Ct. 2340 (1978) ("assessment will only be disturbed when the taxpayer has proved by 'clear and cogent evidence' that the income

attributed to the State is in fact 'out of all appropriate proportion to the business transacted ... in that State,' or has 'led to a grossly distorted result.' ") (internal citations omitted).

79. *Container Corp.*, 463 U.S. at 169, 103 S.Ct. 2933 (citing *Mobil Oil Corp. v. Comm'r of Taxes of Vermont*, 445 U.S. 425, 436, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980)).

business" within the taxing state.[80] Sufficient connection has been found to exist where the taxpayer maintains an office in the taxing state.[81] Here, it is undisputed that the Bank had the requisite minimum contacts with Delaware: the Bank's home office and the Bank's sole banking office were both located in Wilmington, Delaware. Those contacts are sufficient to satisfy the Due Process minimal connection requirement.

█ For the second requirement to be satisfied, there must be a rational relationship between the taxed income and the "values connected with the taxing State."[82] The inquiry is "whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state."[83] The privilege of carrying on a business in the state; police and fire protection; emergency health services; public utilities; and a safe climate to conduct business have been deemed sufficient to support imposition of the tax.[84] The

Superior Court held that "the Bank receives many of Delaware's benefits and protection, thus satisfying this requirement."[85] The record discloses no basis to disturb that finding.

For these reasons, the Commissioner and the Superior Court correctly concluded that the Delaware bank franchise tax, as applied to the Bank, satisfies the Due Process requirements imposed by the United States Constitution.

### Abatement of Penalties

Finally, the Bank claims that the Commissioner erred by refusing to abate the assessed penalties, which, according to the Bank, totaled $14 million and were "excessive compared to the activities conducted in the State." Before reaching the issue of excessiveness, we note that the Bank's computation of the "amount" of penalties as $14 million is factually incorrect.[86] The $14 million includes the penalties ($4 million) *plus* the additional tax liability as-

---

80. *Mobil Oil Corp.*, 445 U.S. at 436, 100 S.Ct. 1223 (citing *Wisconsin v. J.C. Penney Co.*, 311 U.S. 435, 444–45, 61 S.Ct. 246, 85 L.Ed. 267 (1940)).

81. *D.H. Holmes, Ltd. v. McNamara*, 486 U.S. 24, 32, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988); *Nat'l Geographic v. Cal. Equalization Bd.*, 430 U.S. 551, 556, 97 S.Ct. 1386, 51 L.Ed.2d 631 (1977). Despite their similar language, the nexus requirements of the Due Process and Commerce Clauses are not identical. The Commerce Clause is more stringent than the Due Process Clause on the state's taxation power. *See Quill Corp. v. North Dakota*, 504 U.S. 298, 312–13, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). *See also J.C. Penney Nat. Bank v. Johnson*, 19 S.W.3d 831, 836–37 (1999).

82. *Moorman Mfg.*, 437 U.S. at 272–73, 98 S.Ct. 2340 (citing *Norfolk & Western Ry. Co. v. Missouri State Tax Comm'n*, 390 U.S. 317, 325, 88 S.Ct. 995, 19 L.Ed.2d 1201 (1968)).

83. *J.C. Penney*, 311 U.S. at 444, 61 S.Ct. 246.

84. *See J.C. Penney*, 311 U.S. at 444, 61 S.Ct. 246; *Bridges v. Autozone Properties, Inc.*, 900

So.2d 784, 809 (La.2005); *Zelinsky v. Tax Appeals Tribunal of State*, 1 N.Y.3d 85, 769 N.Y.S.2d 464, 801 N.E.2d 840, 848 (2003).

85. Super. Ct. Op., at * 11. In so ruling, the trial court observed that Delaware's ability to impose a tax is not affected by the fact that "the mortgages were originated or approved somewhere else nor that the funds for the mortgages came through Pittsburgh." Super. Ct. Op., at *12 (citing *J.C. Penney*, 311 U.S. at 444, 61 S.Ct. 246 (holding that "[t]he fact that the tax is contingent upon events brought to pass without a state does not destroy the nexus between such a tax and transactions within a state for which the tax is an exaction.''))

86. The Superior Court adopted the Bank's incorrect computation: "The Commissioner also assessed late payment penalties amounting to $14,515,474 for 2000–2003, and also another penalty of $5,251.74 for each day after May 20, 2005 that the assessments remain unpaid." *See* Super. Ct. Op., at *3.

sessed ($10 million), as of the date of the Commissioner's decision (May 20, 2005).[87] Thus, the penalties imposed totaled $4 million, not $14 million as the Bank claims.

Turning to the legal merits, the Commissioner assessed penalties under Section 1104(e), which provides that "[i]f any banking organization ... shall fail to pay any tax due under this chapter on or before the due date, a penalty of 0.05 percent shall be assessed for each day that the same shall remain unpaid after such date."[88] The Commissioner refused to abate the penalties, holding that the amount was appropriate "in relation to the activities [the Bank] conducted and the income it earned in [Delaware]," and was not excessive even though "the review of the Bank's franchise tax returns for the years at issue did not begin until after March 2003."[89] Under Section 1114, the Commissioner "is *authorized* to abate the unpaid portion of the assessment of any tax, interest, penalty, additional amount or addition to the tax, or any liability in respect therefore, which is ... [e]xcessive in amount."[90] The usage of the word "authorized" indicates that the Commissioner

has discretion whether or not to abate. The Internal Revenue Code ("IRC") contains a virtually identical abatement provision,[91] which has been construed as conferring discretionary power to the taxing authority.[92]

In considering whether to exercise that discretionary power, the Commissioner held that the phrase "excessive in amount" should not be given "an expansive meaning that includes some general notion of equitable fairness."[93] Starting from that premise, the Commissioner mechanically applied the statutory percentage rate to the additional tax liability assessed, as of March 1, 2001 (the due date for the 2000 tax). Federal District Courts and the United States Tax Court have held that a taxing authority abuses its discretion if it denies a taxpayer's abatement request "arbitrarily, capriciously, or *without sound basis in fact* or law."[94] Here, the record does not disclose any basis in fact for the Commissioner's refusal to abate, because the Commissioner recited no specific facts to support its decision. We recognize that the applicable Delaware statutes (Sections

**87.** *See* Comm. Dec., pp. 17–21.

**88.** 5 *Del. C.* § 1104(e). Chapter 5 contains two other provisions establishing penalties in connection with the bank franchise tax (§ 1104(a) and (c)), which are *not* applicable here.

**89.** Comm. Dec., p. 21.

**90.** 5 *Del. C.* § 1114(a.1) (italics added). Although the Commissioner is authorized to abate both tax assessments and penalties, the Bank is only disputing the Commissioner's refusal to abate the penalties.

**91.** *See* I.R.C. § 6404(a)(1). *See also* 30 *Del. C.* § 538 (Chapter 30's abatement provision, virtually identical to the IRC provision).

**92.** *See Matter of Bugge,* 99 F.3d 740, 744 (5th Cir.1996); *Wright v. C.I.R.,* T.C.Memo. 2004–69, at *2, 2004 WL 532180 (U.S.Tax.Ct.2004).

**93.** Comm. Dec., p. 21. *But see Edelson v. C.I.R.,* 829 F.2d 828, 832 n. 4 (9th Cir.1987) (noting that the Commissioner is free to forgive a portion of the tax, should the taxpayers apply for "executive clemency").

**94.** *Beall v. U.S.,* 335 F.Supp.2d 743, 748 (E.D.Tex.2004) (emphasis added); *Dadian v. Comm'r,* T.C. Memo. 2004-121, 2004 WL 1118291 at *3 (U.S.Tax Ct.2004) (citing *Woodral v. Comm'r,* 112 T.C. 19, 23, 1999 WL 9947 (U.S.Tax Ct.1999)). State courts have also specifically held that a tax authority's refusal to abate penalties may not be arbitrary. *See, e.g., J.M. Smucker, LLC v. Levin,* 113 Ohio St.3d 337, 865 N.E.2d 866, 869 (2007); *Patel v. Director, Div. of Taxation,* 13 N.J.Tax 509, 515 (1993); *Norris v. Commonwealth,* 155 Pa.Cmwlth. 423, 625 A.2d 179, 182–83 (1993).

1104(e) and 1114(a), defining the penalty and, respectively, authorizing abatement) afford little guidance as to the factors to be considered when assessing (and when deciding whether to abate) a bank franchise tax penalty. The counterpart provisions of the IRC and of Chapter 30 (Taxation) of the Delaware Code are instructive in this regard, however.[95]

Both Section 6651(a) of the IRC and Section 534 of Chapter 30 distinguish between penalties for failure to file a return that results in failure to pay the tax, and penalties for failure to pay additional tax assessed following the taxing authority's review of a filed return.[96] Failure to file a return (which did not occur here) results in higher penalties, which are calculated to run from the day that the return should have been filed. In contrast, where a return is filed and additional tax is assessed, a penalty is due only if the taxpayer fails to pay the balance within a prescribed period of time from the assessment.[97]

██ Here, the Commissioner assessed penalties at a daily rate of 0.05% per day, running from March 1, 2001, when the 2000 bank franchise tax first became due. To assess penalties from March 2001, in a case where no additional tax liability was assessed until October 2003, appears arbitrary.[98] The Commissioner insists that it was not required to notify the Bank of the deficiency any sooner than it did, because the statute contains a three year period of limitations, which was observed.[99] But the statute of limitations is not the only factor informing the sound exercise of discretion. 30 *Del. C.* § 521(a) directs that *"[a]s soon as practicable* after any return is filed, the [tax authority] shall examine it to determine the correct amount of tax."[100] Here, the Commissioner's office did not object to the Bank's 2000 Franchise Tax Return until nearly three years after that return was filed. Indeed, not until the Commissioner's October 6, 2003 letter was the Bank told that its Returns for the tax years 2000–2002 were incorrect. Only at that time was the Bank's liability recalculated based on the disallowance of the line 4(b) deduction.

The Commissioner rejected without explanation the Bank's contention that the three year administrative delay justified an abatement of penalties. Before this Court, the Commissioner claims that the delay was attributable to the Bank's failure to submit the requested documentation in support of the line 4(b) deduction. That

---

95. It is proper to look at the general taxation principles contained in the Delaware Code, because several provisions in Chapter 5 (Banking) specifically cross-reference Chapter 30 (Taxation). Moreover, this Court has looked at similar federal tax provisions when a Delaware tax statute was ambiguous. *See Director of Revenue v. CNA Holdings, Inc.,* 818 A.2d 953, 957–59 (Del.2003); *Logan v. Davis,* 191 A.2d 1, 5 (Del.1963).

96. *See* I.R.C. § 6651(a) and 30 *Del. C.* § 534.

97. Regrettably, 5 *Del. C.* § 1104(e) makes no such distinction.

98. The Commissioner imposed penalties from the due date of the tax for each year in question, not from the date of the notice of assessment. That computation finds no support in Chapter 30 or the IRC, which provide that, where additional tax is imposed, both penalties and interest may be imposed, but only *from the date of the notice of the proposed assessment* and only if the additional tax assessed is not paid within a certain period of time following that notice. *See* 30 *Del. C.* §§ 533 and 534 and I.R.C. §§ 6601 and 6651. We note that only "penalties" may be imposed under Chapter 5 because Chapter 5 does not mention "interest." The Commissioner, therefore, correctly did not assess interest.

99. *See* 5 *Del. C.* § 1111.

100. 30 *Del. C.* § 521(a) (emphasis added).

argument is flawed. The Bank did provide certain apportionment schedules, and the Commissioner and the Superior Court found that those schedules were insufficient to support a line 4(b) deduction. But, during oral argument before this Court, the Commissioner conceded that the submission of *any* documentation, however sufficient, would have been "irrelevant," because the line 4(b) deduction was simply not available to the Bank as a matter of law.[101] Accordingly, for penalty abatement purposes, the Commissioner may not rely on the Bank's failure to provide sufficient supporting documentation.

Finally, Chapter 30 and the IRC provide that penalties should not be imposed when the failure to pay the additional tax liability assessed is "due to reasonable cause and not due to willful neglect."[102] The United States Supreme Court held that "reasonable cause" exists where a taxpayer demonstrates that it exercised "ordinary business care and prudence," and that "willful neglect" means "conscious, intentional failure or reckless indifference."[103] Although it is for the Commissioner, not this Court, to determine whether the Bank met these requirements, it is noteworthy that: (i) the Bank filed its original Franchise Tax Returns consistent with the practice of its predecessor; (ii) the timeliness of the Bank's filings is undisputed; (iii) the Bank requested, and relied upon, the opinion of an independent tax advisor (Ernst & Young) before amending its returns in August 2004; (iv) the Bank later obtained the opinion of a second independent tax advis-

or (PricewaterhouseCoopers); (v) the Bank contested in good faith the assessment of additional tax liability, before the Commissioner, the Superior Court, and this Court; and (vi) the Bank's legal position with respect to the original and the amended Franchise Tax Returns was not frivolous, and the filing of those Tax Returns was not fraudulent.

Because the Commissioner failed to consider any of the above-described circumstances, we are constrained to conclude that the Commissioner abused its discretion by refusing to abate, in an appropriate way, the penalties assessed. It follows that, in affirming the Commissioner's decision, the Superior Court legally erred. Therefore, the penalty provision of the Superior Court order will be reversed, and the case will be remanded with instructions that the Superior Court remand the case to the Commissioner to reconsider the Bank's request for abatement of penalties, in accordance with this Opinion.

### CONCLUSION

For the reasons set forth, the judgment of the Superior Court is affirmed in part, and reversed in part and remanded.

---

**101.** As explained above, that deduction applies solely to entities that have out-of-state branches or subsidiaries. The Bank had no such branches or subsidiaries during the relevant period.

**102.** *See* I.R.C. § 6651(a)(3) and 30 *Del. C.* § 534(b)(2).

**103.** *Director of Revenue v. J.E. Rhoads & Sons, Inc.*, 628 A.2d 1388, 1390 (Del.1993) (citing *United States v. Boyle*, 469 U.S. 241, 245–46, 105 S.Ct. 687, 83 L.Ed.2d 622 (1985)).